**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 1ST AVENUE TJC, LLC <br><br> Plaintiff, <br><br> v. <br><br> OPERADORA DE VUELOS EJECUTIVOS S.A. DE C.V and GRUPO HERMES, S.A. DE C.V., <br><br> Defendants. | Case No. __ <br> Hon. __ <br><br><br> JURY DEMAND REQUESTED |

**COMPLAINT FOR DAMAGES**

Plaintiff 1st Avenue TJC, LLC ("1st Avenue" or "Plaintiff"), for its Complaint against

Defendant Operadora De Vuelos Ejecutivos S.A. de C.V. ("Operadora") and Defendant Grupo

Hermes, S.A. de C.V. ("Grupo Hermes") (collectively "Defendants"), alleges as follows:

**NATURE OF CASE**

1.      1st Avenue had acquired a few planes over the years and was about to make its

most expensive investment to date, in the purchase of a Gulfstream 550 ("G550") jet. 1st Avenue

had thought it had found the perfect match with the offering of the exact model it was searching

for, with relatively low number of hours and owned by one of the wealthiest families in Mexico,

the engines were sure to be in excellent condition, as the plane appeared to be inside and out.

2.      Throughout the negotiations and meetings leading up to the execution of the

purchase agreement Defendants touted the quality of the aircraft and how well it had been

maintained. 1st Avenue was convinced by what appeared to be good and honest representations,

and agreed to purchase the plane for $13,500,000.[1]

3.      What 1st Avenue did not know until after execution of the contract was that Defendants had not been honest, but had concealed and misrepresented the true condition of the engines; they had been run into the ground, with damage and significant material loss from excessive wear and tear. Defendants also had a plan in place to bully 1st Avenue into submission should they be caught in their deception. What Defendants did not anticipate however, was that 1st Avenue would not be intimidated by the wealth and power of the Defendants, but would stand up for what is just and right.  1st Avenue now seeks to hold Defendants accountable under the laws of the United Sates for their bad actions.

## PARTIES

4.      Plaintiff 1st Avenue TJC, LLC is a Delaware limited liability company.  1st Avenue has one Member, 1st Avenue Capital Holding, LLC ("1ACH"), which is also a Delaware limited liability company.  1ACH has two Members, individual Thomas Buttgenbach, and THBco, Inc. a Delaware corporation. Thomas Buttgenbach is, and was as of the filing of this action, a citizen and resident of California. THBco's corporate headquarters and principal place of business is, and was as of the filing of this action, also in California. 1st Avenue, nor any of its Members are, or were as of the filing of this action, citizens of any state or territory of Mexico.

5.      On information and belief, Defendant Operadora De Vuelos Ejecutivos S.A. de C.V. ("Operadora") is a company organized under the laws of Mexico with its principal place of business represented as Paseo de la Reforma 383, Piso 8 Cuauhtémoc, 06500, Ciudad de México, México.

---

[1] Aircraft Purchase Agreement, dated as of February 5, 2020 between Operadora de Vuelos Ejecutivos S.A. de C.V. as Seller, And 1st Avenue TJC, LLC as Purchaser, concerning one (1) Gulfstream model GV-SP (G550) manufacturer's serial number 5182 ("APA") A copy of the APA is attached hereto as Exhibit B.

6.      On information and belief, Defendant Grupo Hermes, S.A. de C.V. ("Grupo

Hermes") is a company organized under the laws of Mexico with its principal place of business

represented as Paseo de la Reforma 383, Piso 8 Cuauhtémoc, 06500, Ciudad de México, México.

## NON-PARTIES AFFILIATED WITH DEFENDANTS

7.      The following currently non-named party witnesses have certain control, agency

ownership liability and relevant information related to the claims made herein and subject to

discovery may later be included in this action as parties.

8.      On information and belief, Grupo Financiero Interacciones, S.A.B. de C.V.

("GFI"), a finance and banking institution then held by one of the wealthiest families in Mexico,

completed a merger in 2018 with Grupo Financiero Banorte, S.A.B. de C.V. ("GFB") wherein it

reportedly transferred substantially all of its assets and liabilities to GFB, making GFB the 3rd

largest bank in Mexico.

9.      On information and belief, Carlos Hank Rohn ("Hank") owns, controls and is

Chair of the Board of Grupo Hermes.  Hank's son, Carlos Hank Gonzalez, ("Gonzales"), is the

Chair of Board and President of GFB.

10.      On information and belief, Defendant Rodrigo Noguez Núñez ("Noguez") holds a

senior position at Grupo Hermes.  As detailed below Noguez was the primary representative  and

negotiator of the APA terms on behalf of  Seller[2].

11.      On information and belief, Defendant Carlos Zardain Escudero ("Zardain") is the

general counsel for Grupo Hermes.

12.      On information and belief, Hector Duran Diaz ("Duran") was general counsel of

Operadora, and is general director of El Agua de Puebla, an entity that is governed by Grupo

---

[2] Capitalized terms used in this Complaint are as defined in the APA unless otherwise defined herein.

Hermes, and also served as general director for Grupo Hermes.

13.   Upon information and belief, Carlos de la Isla Corry ("Corry"), the individual that executed the APA on behalf of Seller, simply with the title "Director" is the current Chief Credit and Risk Officer and Managing Director Risk and Credit Management of GFB.  Corry was also a Director of Management and Finance of Grupo Hermes from 2003 through 2014 and was also on the Board of Directors of Grupo Hermes.

14.   On information and belief, Operadora is one of at least three entities that each holds or has held a single aircraft, such as the G550 at issue here, for the exclusive use of Hank and his family members, each of which at one time was, or still is, under ultimate ownership of entities controlled by Grupo Hermes.

## JURISDICTION AND VENUE

15.   This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.   Venue in the Southern District of New York is proper under *Atlantic Marine Const. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 66 (2013); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) pursuant to the exclusive jurisdiction, venue, and governing law provision of the APA:

> 8.20 Governing Law/Jurisdiction.  This Agreement shall be governed by the laws of the State of New York without consideration to its choice of law provisions other than Section 5-1401 and Section 5-1402 of the New York General Obligations Law.  The parties submit to the exclusive jurisdiction of the state or federal courts located in New York, NY, and the parties agree not to raise, and waive, any objections or defenses based upon venue and forum non conveniens.  The parties agree that the United Nations Convention on Contracts for the International Sale of Goods is specifically excluded from application to this Agreement or the transactions contemplated by this Agreement.

4

APA, Article 8.20

**FACTUAL ALLEGATIONS**

A.     **1st Avenue Searches For Aircraft With Quality Engines**

17.     Over several years, 1st Avenue had acquired a hand full of aircraft, but was now prepared to purchase a larger, more desirable model, the Gulfstream 550 ("G550").

18.     This would be 1st Avenue's most expensive aircraft acquisition to date.

19.     After extensive research and investigation into the operations and ownership economics of the G550, 1st Avenue had developed a solid plan and was ready to begin its search for the ideal G550 to purchase.

20.     What was particularly desirable about the G550 was the long-life expectancy of its Rolls Royce ("RR") engines.  Provided that the RR engines have been well maintained and are in good condition, these engines can easily exceed 8000 - 9000 hours before requiring major mechanical and reparative work, such as a hot section overhaul.

21.     Certain aircraft engines have manufacturer set time limits for certain major events such as overhauls.  When the time set for such work is mandatory, it is referred to as "Hard Time".

22.     When on Hard Time, most owners choose to have the aircraft covered under RR "TotalCare" engine service program, which is akin to an insurance/warranty program and includes coverage for work required under Hard Time.  The cost for the RR TotalCare program is approximately $1200/hour (*e.g.*, for this aircraft at the time of the RR borescope inspection described below, would have cost the owner approximately $3.8mm).

23.     However, over the years, RR discovered that its engines were capable of being in far better condition than previously expected during Hard Time inspections, and, as a result, RR,

as the manufacturer of these engines, created the new option for owners to consider of placing the engines "On Condition" for major engine work.

24.     On Condition means the pre-set "Hard-Time" work is not required unless, during the manufacture's pre-set times for borescope inspections, a certain measure of abnormal excessive wear and tear or other significant operational damage is discovered.

25.     In the case of the G550 engine, it is not uncommon for an engine On Condition to exceed 8000 hours before requiring the type of mechanical and reparative work that is mandatory under Hard Time.

26.     Thus, many savvy owners who plan to maintain their aircraft engines in reasonably good condition, place the engines On Condition upon purchase without the RR TotalCare program, thus potentially saving millions of dollars over the years.

27.     What made the G550 an even more desirable aircraft to 1st Avenue was that its search would not be limited or controlled by whether the engines were On Condition or Hard Time, as RR had also created an option for subsequent owners to switch the engines from Hard Time to On Condition.

28.     After careful deliberation, 1st Avenue determined that finding an aircraft with relatively low hours and holding that aircraft On Condition made best economic sense. Therefore, in searching for its first G550, 1st Avenue placed little importance on which plan the aircraft engines were currently on, *i.e.,* Hard Time or On Condition.

29.     The most important aspect of the aircraft effecting 1st Avenue's decision to purchase or not, was the quality of the engines.

30.     1st Avenue did not require that the engines be in pristine quality.  1st Avenue did require that the engines be without obvious damage, or other indications or reasons to suspect

that the normal life expectancy of the engines might be negatively impacted, such as evidence of maintenance or inspection requirements that were not standard, or use and/or damage to engines that were not normal for the age and hours of that aircraft.

**B.    1st Avenue Locates And Negotiates Purchase Of Defendants' G550**

31.    1st Avenue initially noticed the offering of a beautiful Gulfstream G550 (manufacturer serial number 5182) (the "Aircraft") for sale in December 2019.

32.    Through 1st Avenue's designated agent, Douglas Wattoff ("Wattoff"), 1st Avenue made contact with Defendants' designated agent, Conan McGale ("McGale"), to obtain additional information about the Aircraft.

33.    On December 3, 2019 McGale provided 1st Avenue with a link[3] for a 360 view of the Aircraft as well a 26 -page PDF providing the specifications and contents of the Aircraft for sale in detail.

34.    After reviewing those materials, 1st Avenue expressed even further interest in the possible purchase, as from all appearances the Aircraft looked to be in great shape.

35.    Additional communications ensued between the parties' respective representatives, Wattoff and McGale.

36.    At that time, and throughout the negotiations, it was emphasized to the Defendants' representatives that most critical to 1st Avenue's decision to purchase the Aircraft was that the engines must be in good condition.

37.    Wattoff told McGale that due to the importance of the condition of the engines to 1st Avenue that it would be best to know immediately if there were any possible issues with the engines, and to obtain detailed information on the condition of the Aircraft and its prior

---

[3]  https://www.thejetbusiness.com/jets/5182_2008_Gulfstream_G550.html

maintenance before spending the time and travel expenses for an initial cursory review.

38.     McGale advised that the engines were in great shape and that there was only a minor foreign object debris ("FOD") issue that had already been addressed, and that Defendants would provide that information in advance.

39.     On December 9, 2020, Defendants provided materials that represented the "current status of the aircraft" "as of October, 2019".

40.     McGale further stated that he had requested Defendants to provide "a more up-to-date Current Status and would forward" that information to 1st Avenue "as soon as received".

41.     The following materials, each dated October 21, 2019, were provided to 1st Avenue in that December 9, 2019 communication: a 608 page "Status Detail Report"; a 50-page 3 year "Maintenance Next Due Report", and a 46-page "Technical Bulletins Report".  In addition, Defendants provided a 2-page report described as "the maintenance record of the FOD inspection".

42.     McGale concluded the transmission stating that "the [Defendants'] CEO has requested you include a line [in the Letter of Intent ("LOI")] confirming you will increase the offer following a satisfactory cursory inspection" (emphasis added).

43.     As part of these initial discussions and prior to submission of the proposed LOI by 1st Avenue, Wattoff specifically asked McGale to confirm if the plane had a 88 Parameters Flight Data Recorder as part of its aviation equipment as 1st Avenue considered this to be an important component for this Aircraft, and McGale confirmed the Aircraft did include that equipment as advertised – specifically, it was listed as part of the Aircraft's avionics suite in Defendants' materials as:  "FDR (Flight Data Recorder) – 88 Parameters".

44.     No additional information was provided prior to the cursory visual inspection and

nothing in any of the over 700 pages of material provided to 1st Avenue as of that time had any mention or suggestion that the engines were anything less than normal, and certainly nothing to suggest the existence of the material damage to the engines later discovered by 1st Avenue.

45.     Relying upon the materials provided, and representations made as to the superior condition and quality of the overall Aircraft, and particularly regarding the quality of the engines, 1st Avenue elected to proceed with the cursory visual inspection and present the LOI as requested, with an agreement to increase the price if the visual inspection appeared to confirm the superior quality of the Aircraft as represented.

46.     From the outset of these discussions, 1st Avenue understood Grupo Hermes was the real "seller" in this transaction.

47.     As discussed below, this understanding was confirmed when 1st Avenue was told by Defendants that this Aircraft was not a chartered Aircraft held by a charter company, but was actually the personal Aircraft of the owner and CEO of Grupo Hermes.

48.     On information and belief, Grupo Hermes held ownership and control over all assets and operations related to its Aircraft, including the Aircraft and all those acting with authority in connection with this transaction on behalf of Operadora de Vuelos Ejecutivos (the named "seller" in the APA) were ultimately employed by and controlled by Grupo Hermes.

49.     Therefore, as established in the alter ego allegations at paragraphs 128 through 140, for the purposes of the claims made herein, Grupo Hermes and Operadora de Vuelos Ejecutivos are treated as one in the same and referred to herein collectively as Defendants and are both properly treated for legal purposes as the "Seller".

**C.     1st Avenue Conducts A Cursory Visual Inspection And Continues Negotiations**

50.     On January 6, 2020, 1st Avenue conducted a cursory visual inspection of the

Aircraft at West Palm Beach airport (KPBI) in Florida.

51. The following people were in attendance at the January 6, 2020 meeting: For 1st Avenue: Wattoff, and 1st Avenue's outside counsel, Justin Marchetta ("Marchetta"); For Defendants: McGale; Rodrigo Pence ("Pence") (identified as CEO of Defendants' aviation division); Noguez (also identified as CEO) and Rodrigo Cevallos Morales ("Cevallos") (Defendants' pilot); also present was Fred Wuerth ("Wuerth") of PrivateSky Aviation Services ("PrivateSky"), the company chosen to conduct the formal inspection of the Aircraft if an agreement was reached.

52. During that meeting, with all present, and while in the Aircraft during the visual inspection, Wattoff again advised Defendants' representatives that it was very important to 1st Avenue that the engines were in good shape and inquired if there had ever been any lightning strikes or any other indication of damage in the engines.

53. Noguez responded that the engines were in great shape and there was no indication of any damage.

54. In furtherance of that discussion, Marchetta pulled up the maintenance record on his cell phone of the FOD inspection performed in 2017 that McGale previously provided, and showed that to Noguez to confirm if there was any concern of continuing issues from that event. Noguez said it was a minor issue just caused by a landing light that was hit and everything had been addressed long ago.

55. Finally, to close out that issue, Wattoff asked about the results of the follow-up borescope inspection after 500 hours as noted in the FOD report.

56. Noguez said there were no issues reported and assured Wattoff that the engines were in good shape, again, emphasizing the great maintenance program Defendants have and

assuring that the 1st Avenue representatives will be very impressed with the flight department and overall maintenance program Defendants have when they visited the facilities in Mexico.

57.     After the cursory visual inspection, further communications occurred and the LOI was negotiated and exchanged.

58.     The non-binding LOI, dated January 24, 2020, was agreed to and executed by Wattoff as representative for 1st Avenue and by both Noguez and Pence for Defendants.[4]

59.     During that time McGale contacted Wattoff and said the Defendants wanted a 1st Avenue representative to come to their facilities in Mexico to perform the full logbook review prior to the visit of 1st Avenue's President, Thomas Buttgenbach ("Buttgenbach"), to the facilities, execution of the APA and transporting the plane to PrivateSky for the full inspection.

60.     Wattoff found that to be a very odd request and told McGale that the full logbook review would be done by PrivateSky at its facilities during the full inspection as is normal and further suggested to McGale if there was anything of concern about the logbook to let him know before the scheduled trip to Mexico. McGale did not advise of any concerns or issues with the engines.

**D.     1st Avenue Visits Defendants' Aircraft Operations And Maintenance Facilities In Mexico And The Parties Execute The APA**

61.      On February 5, 2020, Buttgenbach, Wattoff, and other 1st Avenue representatives visited Defendants' aircraft operations at Adolfo Lopez Mateos International Airport, Toluca, Mexico.

62.     Present on behalf of Defendants at that time were Pence, Noguez and Cevallos.

63.     The parties intended, barring some unforeseen complications, that the APA would

---

[4]  A copy of the LOI is attached hereto as Exhibit A

be executed that day and the Aircraft would be flown to PrivateSky's facility for the full logbook review and full technical inspection.

64.     There were numerous people in the hanger facility during the February 5, 2020 meeting, but it appeared to be a shared hanger under the control of Performance Air.

65.     Buttgenbach noticed another new aircraft in the hanger, a larger Gulfstream 650. Noguez advised that this was the "boss's" new jet, Hank the CEO of Grupo Hermes, which is why the G550 was for sale.

66.     Buttgenbach inquired further with Noguez about the operations and of the prior use of the G550 as part of a charter operation.  Noguez stated that while technically classified as a charter company it was only set up that way for tax purposes and the G550 had only been used by Hank and his family.

67.     Buttgenbach also asked why the G550 was not on the RR TotalCare engine maintenance program.  Noguez stated that due to the quality of the engines Hank believed it did not make sense to pay RR for repairs that may never be required.  Buttgenbach told him he agreed with Hank, which is why 1st Avenue was interested in a G550 like this one since its engines, if well maintained, have very long lives.

68.     After further visual inspection of the Aircraft and upon ensuring that it had all loose equipment associated for the Aircraft on board, Buttgenbach executed the APA on behalf of 1st Avenue.  The APA had already been executed on behalf of Defendants.

69.     Upon execution, Noguez shook Buttgenbach's hand and told him he was getting an exceptional Aircraft.

70.     Upon departure, after the start up procedure, Defendants' pilot taxied the Aircraft to customs for inspection and to fill out forms that are required for all international departures.

71.     The process took approximately 20 minutes and during that time the pilot shut down one of the engines.

72.     Buttgenbach found that strange and asked the pilot why he had shut down the engine.  The pilot advised that it was due to the noise caused in the customs office.

73.     Buttgenbach thought nothing more about that until after discovery of the engine damage and investigation into the possible cause.

74.     The Aircraft was then flown to PrivateSky's facilities in Fort Lauderdale for the full logbook review and technical inspection.

**E.     1st Avenue Seeks Additional Protection To Insure Engines Are In Good Condition**

75.     From the initial communications with McGale in December 2019, and in every meeting with Defendants' representatives since, as well as at the execution of the APA, 1st Avenue emphasized the importance of the quality of the engines and the need for full disclosure of possible issues.

76.     As aggressive as 1st Avenue was in emphasizing the importance of quality engines, the Defendants' representatives were as aggressively assuring 1st Avenue that the engines were as in great of shape as was the visual appearance of the Aircraft.

77.     There was no obvious reason at any time before execution of the APA to doubt those representations, especially since it was also represented that a borescope inspection of the engines had just been performed by RR less than 300 hours before and no issues were identified.

78.     However, because of the critical importance to 1st Avenue that the engines be in good condition in order to purchase the Aircraft at the price as agreed, and the fact the Aircraft and its engines were being purchased in the "as-is" condition upon closing, several provisions in the APA were included to help protect against any unwanted or unforeseen surprises regarding

the engines.

79.     Most importantly was the inclusion of the Delivery Condition[5] that Defendants deliver the Aircraft at closing with no "non-standard inspection intervals" and with no modifications to the normal inspection intervals for the Aircraft.

80.     These conditions would capture any yet unknown issues with the Aircraft and help identify if the engines or other aspects of the Aircraft were not in as good shape as they might otherwise seem.

81.     Without these provisions (which are not unusual to be required for aircraft delivered "as-is"), 1st Avenue would not have agreed to the purchase, as the price it agreed to pay was based on what Defendants had presented as a well-maintained aircraft with no known engine damage or defects.

82.     Defendants' agreement to the inclusion of these material provisions provided 1st Avenue with the further comfort that Defendants had made full and honest disclosures and had nothing to hide about the quality of the engines.

83.     What 1st Avenue did not know, was Defendants' preconceived plan to reject the plain meaning and intent of these provisions should 1st Avenue discover Defendants' concealment and misrepresentation as to the true quality of the engines.

**F.      1st Avenue Discovers Defendants' Misrepresentation And Concealment Of Material Information And Engine Damage**

84.     Pursuant to the terms of the APA, upon arrival from Mexico the Aircraft was presented to the inspection facility, PrivateSky, for the full logbook review and full inspection.

85.     Throughout the inspection process, Defendants attempted to conceal from 1st

---

Avenue the true condition of the Aircraft.

86.     For example, one of Defendants' technical staff was present at the inspection facility for the entire inspection, over several weeks, which was very unusual in the typical sale of an aircraft.

87.     Perhaps more concerning was that Defendants prohibited Wattoff from talking with Defendants' representative during the inspection.

88.     Another attempt to prevent 1st Avenue from discovering the truth was Defendants' instruction to RR that they were not to disclose anything to 1st Avenue as to any prior inspections, work, or knowledge RR had about this Aircraft.

89.     Since the parties agreed that 1st Avenue would be accepting the Aircraft in the "as-is" condition at the closing, the whole purpose of the inspection was to confirm the condition of the Aircraft as represented and to uncover any material issues previously unknown to either party.  However, Defendants engaged in a clear bad faith effort to keep 1st Avenue from learning the truth about these engines.

90.     The results of PrivateSky's full logbook review and full inspection were shocking.

91.     From the logbook review, many deficiencies were identified, however, most significant was that the logbook had no record of the FOD report 500 hour repeat inspection, nor was there any evidence that such an inspection had ever been performed.

92.     The FOD report noted the follow-up borescope inspection was to be performed after 500 hours from the FOD report issued in 2017.

93.     At the time the FOD report was issued it showed the Aircraft had logged 2256.7 hours, which would have required that follow-up borescope inspection to have been conducted well before the date it was placed on the market for sale, by which time the specifications

represented by Defendants' showed the aircraft to have logged 3017 hours.

94.     Defendants knew 1st Avenue believed that the borescope inspection had already been conducted and had been told no issues had been uncovered, and that the misrepresentation and concealment of the true fact there had not been such an inspection was material, as it further supported Defendants' false representation that the engines were in good shape.

95.     Either the borescope inspection was performed, and Defendants concealed its negative findings, or the inspection was not performed because Defendants knew that the inspection would have disclosed the significant damage and material loss that the Final Inspection report eventually uncovered.

96.     Defendants' actions in attempting to convince 1st Avenue of the unusual and unreasonable process of having the full logbook review conducted at Defendants' facilities in Mexico rather than having the normally expected thorough review by the inspection company, also suggests Defendants were actively trying to hide the issue.

97.     Defendants knowingly made material misrepresentations and/or concealed material information about the Aircraft and its engines to induce 1st Avenue into executing the APA.

98.     Another misrepresentation discovered during the logbook review was a serious discrepancy between the specifications provided by Defendants and what was actually installed in the Aircraft.

99.     Specifically, the Aircraft did not have the flight data recorder (FDR) represented to be part of the aircraft's avionics suite in all of Seller's marketing materials.

100.     Also, as noted above, well before the execution of the APA, Wattoff requested and obtained confirmation from Defendants that an 88 Parameters FDR was installed in the

Aircraft.

101.    When this issue was raised with Defendants, Defendants suggested that they would be willing to negotiate a minor price adjustment to address the issue, but then withdrew the offer, claiming they had no obligation to provide that equipment as part of the Aircraft.

102.    The most significant defect and deficiency uncovered was identified in the Final Inspection Report.

103.    The borescope inspection report from RR disclosed that the engines were as far from good shape as could be imagined. [6]  Instead, the engines appeared to be on their last legs due to significant damage and material loss, recorded as: ***Defects noted: the trailing edge of the nozzle guide vanes have erosion and missing material*** so much so as requiring the addition of non-standard interval inspections. It was abnormal to see these engines in such poor shape and with such excessive wear at only 3000 hours.

104.    1st Avenue has since been informed that the cause of damage and missing material of this nature is likely due to running the engines hotter than normal, and that basing the Aircraft at a high-altitude airport such as in Mexico City would greatly increase the risk of this type of excessive wear, especially if attention was not paid to that issue.

105.    Defendants knew of this impact on the engines.

106.    As already established, Defendants have owned and maintained numerous jet aircraft for many years out of Mexico City.  Defendants would have experienced this same type of wear and tear on its previous aircraft over the years.

107.    The lead technician at PrivateSky also advised Buttgenbach that it was not plausible or reasonable that Defendants would not have known about this excessive wear and

---

[6] Copies of the RR BSI reports are attached hereto as Exhibit C.

tear.

108.    If the FOD 500 hour follow-up borescope inspection was not performed, the only rational conclusion was that the Defendants sought to conceal the engine damage.

109.    In the later discussions with Buttgenbach, described below, Noguez admitted, after the fact, that Defendants knew about this problem, but dismissed the non-disclosure as a minor issue.

110.    Finally, even after 1st Avenue uncovered the true state of the engines, not only did Defendants claim the damage that required the repeat inspection to be minor, but claimed the inclusion of the repeat inspection requirement was not considered a "non-standard inspection interval" or a "modification" to the "normal" inspection intervals for the Aircraft.

111.    RR has confirmed this additional inspection requirement is in fact a "non-standard inspection interval".  RR has confirmed that removal of that inspection requirement can only occur upon a hot section overhaul of both engines.

112.    Defendants were required to deliver the Aircraft in the Delivery Condition as defined by the APA, which prohibits the presence of a "non-standard inspection interval" or "modification" to the "normal" inspection intervals for the Aircraft.

113.    1st Avenue has been advised that the estimated cost for such work would likely exceed $4,500,000.

114.    Defendants clearly knew that had they disclosed anything to suspect the engines might have this engine type of material loss and damage, most prospective purchasers would not consider looking at the aircraft, and Defendants certainly knew after 1st Avenue's persistency in seeking assurance that the engines were in good shape, that it would not have entered into the APA in the first instance.

**G.     Defendants' Intent To Deceive**

115.    Defendants believed they could successfully hide the G550's engine damage. With the Aircraft being sold in its "as-is" condition at Close, Defendants hoped the issues and information it misrepresented and concealed, or at least the full extent and impact of that deceit, would not be discovered by 1st Avenue before the Close.

116.    Defendants next concluded if they were caught, Defendants would attempt to convince 1st Avenue the damage was minor and force 1st Avenue to accept a minimal discount off of the purchase price, but nothing close to the actual cost to fix the damage.

117.    Defendants determined  if that failed, and 1st Avenue refused to the minimal price reduction, they would claim the very provisions that were intended to protect 1st Avenue and uncover such undisclosed defects (even if previously unknown to Defendants) did not apply to the material damage discovered, and claim 1st Avenue was in breach of the contract, hoping that 1st Avenue would agree to walk away rather than having to pay more in attorney's fees than it could possibly receive under the contract.

118.    Finally, even in Defendants' worst-case scenario, if 1st Avenue would not bow to their pressure, and 1st Avenue decided to incur the extensive attorney's fees required to obtain an award, Defendants concluded in the end, Defendants would incur minimal loss.  That is because the APA's liquidated damages provision limited 1st Avenue to the return of its own money on deposit, and reimbursement for the inspection and flight test costs.

119.    The Aircraft required a 144-month inspection, as well as the need to officially clear the FOD 500 hour inspection requirement, and Defendants knew 1st Avenue's inspection would satisfy those requirements. Thus, if 1st Avenue caught them in the deception and 1st Avenue would not agree to the limited discount, and decided to expend the necessary attorney's

fees to obtain an award, at most Defendants would only be out of pocket the minimal amount required to cover 1st Avenue's flight costs.

120.     Proof of this scheme came after the inspection report was issued, and 1st Avenue made the expected demand to Defendants to address the damage.  The primary decision makers, Buttgenbach and Noguez, talked directly in what 1st Avenue believed at the time was to be a good faith effort to resolve the issue.  Buttgenbach told Noguez had he known that the engines were in bad shape he would have had no interest in the purchase and certainly would not have entered into the APA.

121.     During those phone conversations, Noguez admitted to Buttgenbach that Defendants knew of the material loss in the engines "but didn't think it was that big a deal" and admitted they had decided if the problem was discovered, "at the right time", Defendants would offer a "modest" discount to compensate for the higher cost to overhaul the engines.

122.     Consistent with this plan, Noguez suggested they just agree on a reduction of a few hundred thousand dollars and continue with the transaction.  However, Buttgenbach had already investigated the actual cost to address the problem, and it was closer to $4,500,000.

123.     Since Noguez claimed the damage was minor and could be corrected for a few hundred thousand dollars, Buttgenbach told Noguez that 1st Avenue was still willing to buy the Aircraft at the price stated in the APA if Defendants made the repairs necessary to remove the repeat inspection requirement noted in the RR borescope and final inspection reports, but Noguez refused.

124.     Finally, 1st Avenue suggested to resolve the dispute by having Defendants' representatives and 1st Avenue's representatives have a joint conversation directly with RR to confirm the extent of the damage, the classification of the additional repeat inspection

requirement and the work required to remove that condition prior to Close. Defendants rejected that suggestion, obviously because they knew RR would prove Seller wrong on all counts.

125.    As will be presented in more detail below in the cause of action for breach of contract, under the process set-forth in the APA on May 15, 2020, 1st Avenue timely presented Defendants with conditional acceptance of the Aircraft, subject to correction of Deficiencies and delivery of the Aircraft at Close in the Delivery Condition defined in the APA.

126.    Defendants later claimed that all Deficiencies had been corrected and the Aircraft had been "returned to service" on May 28, 2020, requiring the closing to occur, under the APA, on June 4, 2020.

127.    Upon confirming it would be impossible for the Aircraft to be presented at Close in the Delivery Condition, 1st Avenue served Defendants with the formal notice of breach as required under the APA on June 3, 2020.  Defendants continue to reject the plain meaning and intent of the Delivery Condition requirements in the APA, asserting 1st Avenue must accept the Aircraft "as is" with the existing previously undisclosed defects and engine damage.

**H.     Grupo Hermes Is the Alter Ego Of Operadora**

128.    On information and belief, Operadora was created for the sole purpose of holding title to the Aircraft and to insulate Grupo Hermes (and the Hank family) from any liability relating to the fraud Defendants looked to perpetrate in selling the Aircraft.

129.    Indeed, Noguez advised that, while technically classified as a charter company, Operadora was only set up that way for tax purposes and the G550 had only been used by Hank (the Chair of the Board of Grupo Hermes), and his family.

130.    On information and belief, Operadora was nothing more than a vehicle that Grupo Hermes used to conduct its own business with an added level of liability protection.

131.    Further, during the negotiation and execution of the APA, the individual representatives of Defendants clearly either held themselves out as or were otherwise identifiable as agents of Grupo Hermes.

132.    For example:

(i)      Seller's/Defendants' primary representative and negotiator, and person identified as Seller's CEO, e-mail "signature" shows his business affiliation as follows:

**Rodrigo Noguez**
ronoguez@grupohermes.com.mx
Tel.: 52 (55) 5326-8600 Ext.: 6492
Reforma 383, 12, Col. Cuauhtémoc C.P. 06500, México, D.F.



(ii)     The APA was executed by Corry as a "Director". Corry is the Chief Credit and Risk Officer, Managing Director Risk and Credit Management, and on the Board of Directors for GFNorte and was also the Director of Management and Finance from 2003 through 2014 and was on the Board of Directors of Grupo Hermes;

(iii)    Zardain is the general counsel for Grupo Hermes and was copied on emails sent by Defendants to 1st Avenue and its agents relating to the APA.  Zardain was specifically copied on the email sent by Norguez attaching the executed APA on the same morning as it was executed in Mexico by Buttgenbach.

(iv)     Duran served as general counsel of Operadora and was also a general director for Grupo Hermes. Duran is currently a general director of another Grupo Hermes' controlled entity.

133.    On information and belief, the aforementioned individuals who played significant roles in the negotiation of and/or sale of the Aircraft to 1st Avenue, were acting not as agents of Operadora, but of Grupo Hermes during the entire process.

134.    Defendants had LOI directed to Operadora "c/o Grupo Hermes."

135.    Importantly, Operadora, Grupo Hermes, and several other Hank-related entities share the same address, located at Paseo de La Reforma 383Cuauhtemoc, Mexico City, Mexico.

136.    On information and belief, Grupo Hermes completely controlled and dominated Operadora.

137.    On information and belief, for all intents and purposes, Operadora was not its own entity, but a corporate shell used by Grupo Hermes for the sole purpose of selling the Aircraft and avoiding any resulting liability.

138.    On information and belief, Grupo Hermes used Operadora to carry out its own business, specifically, the negotiation and sale of an aircraft known to have serious engine problems.

139.    On information and belief, Grupo Hermes's complete domination of Operadora with respect to the APA is clear from the agents and employees of Grupo Hermes that were involved in the negotiation and execution of the APA.

140.    On information and belief, Grupo Hermes used its domination of Operadora to commit a wrong against 1st Avenue, specifically, in entering into the APA knowingly concealing material facts about the condition of the Aircraft's engines.

**FIRST CAUSE OF ACTION**
**Fraudulent Inducement – Concealment**

I.      **Existing Information Material To 1st Avenue's Purchase Of The Aircraft That Was Not Disclosed By Defendants**

141.   Plaintiff repeats and realleges each and every previous paragraph as if set forth fully herein.

142.   Prior to execution of the APA,  information and facts in existence at that time material to the Aircraft purchase were concealed and/or not disclosed to 1st Avenue, including, but not limited to, the fact that the "FDR (Flight Data Recorder) – 88 Parameters" was not installed and part of the Aircraft aviation suite as represented in written and verbal form by Defendants; the facts surrounding the 2017 FOD report that required follow-up mandatory borescope inspection to be performed after 500 hours from the time of that report, by approximately 2756 hours (or less than 300 hours prior to the APA), which said inspection Defendants represented had been performed and no issues were discovered;  the true fact that the mandatory FOD borescope inspection discovered issues with the engine not disclosed, or the true fact that the mandatory FOD borescope inspection was not performed because Defendants knew serious engine damage and material loss would be discovered and would be reported in the Aircraft records; the engines had more wear and tear than a normal engine at that number of hours; existing damage and material loss to both engines[Id.]; and that the engines were not in the quality condition as represented

II.     **Defendants Had knowledge Of This Existing Information Material To The Aircraft Purchase**

143.   Defendants had knowledge of each of the undisclosed facts and information set-forth herein.

144.   1st Avenue has set-forth detailed facts establishing Defendants' knowledge that

the quality of the engines were much less than represented, and far from being in optimal, or even good shape.  The facts presented above are more than sufficient to give rise to a strong inference of Defendants' knowledge as to each one of the non-disclosures listed above. However, most significant, and at the heart the claims here, is when Defendants were confronted with the results of the RR borescope reported by PrivateSky as "Defects noted: the trailing edge of the nozzle guide vanes have erosion and missing material", Noguez, Seller's primary representative and negotiator prior to the execution of the APA, admitted that Defendants were aware of the issue with the undisclosed engine issues.

145.   Additional facts supporting Defendants' prior knowledge of the excessive wear and tear and poor quality of the engines include:

(i)     Defendants' extensive experience in operating other aircraft for international departure out of the Mexico City area;

(ii)    Defendants' experienced maintenance department's knowledge of the Aircraft and of its previous maintenance records;

(iii)   Defendants' affirmative efforts to hide information regarding the prior maintenance history of the aircraft, *e.g.*, requesting that the logbook review occur in Mexico City;

(iv)    Prohibiting 1st Avenue representatives from speaking with the Defendants' technical representative present at PrivateSky;

(v)     Instructing RR to not disclose prior maintenance history or costs information to 1st Avenue; and

(vi)    As the owner of the Aircraft, Defendants had knowledge of the true facts regarding compliance/non-compliance/results related to the 2017 FOD

report that required follow-up mandatory borescope inspection after 500

hours, as well knowledge that an upgraded FDR (Flight Data Recorder) –

88 Parameters was not part of the Aircraft.

### III.  Defendants Knew The Existing Non-Disclosed Information Was Material To The Aircraft Purchase

146.    The fact that the Aircraft was to be sold "as-is" alone proves Defendants were

well aware that the non-disclosed information was material to the Aircraft purchase.

147.    However, even more compelling is Defendants' position that the APA Delivery

Condition provisions have no application to the issues discovered in the RR borescope report,

combined with the existence of the as-is provision, is *prima facia* evidence that Defendant knew

non-disclosed Information was material to the Aircraft purchase.

148.    From the outset of the negotiations, 1st Avenue emphasized the most significant

aspect of the Aircraft impacting its decision to purchase was the quality of the engines.

149.    Further, from the outset of the negotiations, 1st Avenue also emphasized to

Defendants the importance of full disclosure to its decision to purchase the Aircraft.

150.    1st Avenue also emphasized at the very outset the importance of the FDR (Flight

Data Recorder) – 88 Parameters to the Aircraft purchase.

### IV.  Defendants knew 1st Avenue Had No Reasonable Ability To Discover The Non-Disclosed Information

151.    Defendants' ownership and control of the Aircraft is also *prima facia* evidence of

Defendants' superior knowledge of the Non-Disclosed Information, none of which was readily

available to 1st Avenue prior to execution of the APA.

152.    Seller was well aware of 1st Avenue's inability to obtain the needed information

in the possession and/or control of Defendants prior to the execution of the APA without

Defendants' assistance and approval as evidenced by Defendants' later prohibiting 1st Avenue's representatives from speaking to the Defendants' technical representative present at PrivateSky and instructing RR to not disclose prior maintenance history or costs information to 1st Avenue.

153.    Further Defendants' affirmative actions of misrepresentation regarding the quality of the engines and false representations regarding the completion and results of the mandatory borescope inspection to be performed after 500 hours as required by the 2017 FOD report, establishes Defendants' superior knowledge of the Non-Disclosed Information, and of Defendants' knowledge of 1st Avenue's inability to obtain the information without Defendants' assistance and approval.

## V.    Defendant Concealed Information Material To The Aircraft Purchase With The Intent To Induce 1st Avenue To Execute the APA

154.    Even without the evidence already presented as to Defendants' fraudulent plan, including Defendants' admission of that plan, there is no justifiable reason for Defendants to have concealed and affirmatively misrepresented the significant information material to the Aircraft purchase as detailed above.

155.    The facts set forth herein provide more than sufficient evidence of the reason for Defendants' concealment and misrepresentation, and that was for the purposes of inducing 1st Avenue to enter into the APA.

## VI.    1st Avenue Justifiably Relied Upon The Information And Would Not Have Executed The APA Had The Information Been Known To It

156.     At the outset of the negotiations Defendants provided a substantial amount of records and when confirmation or additional information was requested, there was nothing presented to 1st Avenue that would lead it to suspect Defendants provided anything other than truthful information.

157.    For example, with FDR (Flight Data Recorder) – 88 Parameters that was included in the marketing material, there was no reason to suspect the validity of Defendants' confirmation that it was part of the Aircraft.  Defendant also confirmed on at least two occasions that the FOD borescope inspection had been performed and results showed no issues. Finally, regarding the quality of the engines, there was no reason to suggest Seller was telling anything but the truth. The physical appearance of the Aircraft looked well maintained, Defendant emphasized how great their maintenance facility was, and when 1st Avenue visited Defendants' facilities in Mexico they were told the Aircraft was not heavily used for charter, but rather was, in reality, Hank and his family's private plane.

158.    Finally, as established above, Defendants were in control of most material information about the Aircraft and appeared to have been open and honest with disclosures, so 1st Avenue had no reason to suspect anything had been hidden and was fully justified in believing honest disclosures of information solely within Defendants' possession and control had been made.

159.    As has been thoroughly discussed above, the quality of the engines was 1st Avenue's most significant and material element of consideration for this Aircraft purchase. That was expressed and communicated to Defendants from the outset.

160.    Had Defendants not concealed the information and had they provided truthful answers to the questions posed by 1st Avenue at the outset, it would not have gone beyond the first exchange of information in  December 2019 and 1st Avenue certainly would never have entered into the ADA.

## VII.    Resulting Injury To 1st Avenue

161.    As a result of Defendants' intentional concealment and misrepresentation of

28

material facts, and 1st Avenue's reasonable reliance on the same, 1st Avenue has incurred and

suffered out of pocket damages including, costs and expense incurred for PrivateSky's inspection

and related work, expert consultants, professional designers, pre-litigation counsel fees, travel

and flight costs, as well as additional miscellaneous costs and expenses that would not have

occurred but for Defendants' fraudulent actions, in a total amount in excess of $2,000,000.

**SECOND CAUSE OF ACTION**
**Fraudulent Inducement – Intentional Misrepresentation**

**I.      Misrepresentation of Existing Facts Material to the Aircraft Purchase**

162.    Plaintiff repeats and realleges each and every previous paragraph as if set forth

fully herein.

163.    Prior to execution of the APA,  information and facts in existence at that time

material to the Aircraft purchase were misrepresented to 1st Avenue, as follows: the fact that the

"FDR (Flight Data Recorder) – 88 Parameters" was installed and part of the Aircraft aviation

suite was falsely represented in Defendants' written specifications of the Aircraft contents and

verbally in response to a direct question to Defendants' authorized representative; Defendants'

falsely represented that the required follow-up mandatory borescope inspection to be performed

after 500 hours pursuant to the 2017 FOD report had been completed and no engine issues

discovered was false; Defendants' affirmative representation that the Aircraft engines were in

good condition with no known issues was false.

**II.     Defendants Knew Those Factual Representations Were False**

164.    Defendants knew that the facts set-forth herein were false.

165.    Defendants' knew that the quality of the engines were much less than represented,

and far from being in optimal, or even good shape.  The facts presented above are more than

sufficient to give rise to a strong inference of Defendants' knowledge as to each one of the

misrepresentations listed above.  However, most significant, and at the heart the claims here, is when Defendants were confronted with the results of the RR borescope reported by PrivateSky as "Defects noted: the trailing edge of the nozzle guide vanes have erosion and missing material", Noguez, Seller's primary representative and negotiator prior to the execution of the APA, admitted that Defendants were aware of the issue with the undisclosed engine issues.

166.    Additional facts supporting Defendants' prior knowledge of the excessive wear and tear and poor quality of the engines include:

(i)     Defendants' extensive experience in operating other aircraft for international departure out of the Mexico City area;

(ii)    Defendants' experienced maintenance department's knowledge of the Aircraft and of its previous maintenance records;

(iii)   Defendants' affirmative efforts to hide information regarding the prior maintenance history of the aircraft, *e.g.*, requesting that the logbook review occur in Mexico City;

(iv)    Prohibiting 1st Avenue representatives from speaking with Defendants' technical representative present at PrivateSky;

(v)     Instructing RR to not disclose prior maintenance history or costs information to 1st Avenue; and

(vi)    As the owner of the Aircraft, Defendants had knowledge of the true facts regarding compliance/non-compliance/results related to the 2017 FOD report that required follow-up mandatory borescope inspection after 500 hours, as well as knowledge that an upgraded FDR (Flight Data Recorder)

– 88 Parameters was not part of the Aircraft.

## III.   Defendants Knew Those Factual Misrepresentations Were Material To The Aircraft Purchase

167.    The fact that the Aircraft was to be sold "as-is" alone proves Defendants were well aware those factual misrepresentations were material to the Aircraft purchase.

168.    However, even more compelling is Defendants' position that the APA Delivery Condition provisions have no application to the issues discovered in the RR borescope report, combined with the existence of the as-is provision, is *prima facia* evidence that Defendants knew those factual misrepresentations were material to the Aircraft purchase;

169.    From the outset of the negotiations, 1st Avenue emphasized the most significant aspect of the Aircraft impacting its decision to purchase was the quality of the engines.

170.    Further, from the outset of the negotiations, 1st Avenue also emphasized to Defendants the importance of full disclosure to its decision to purchase the Aircraft.

171.    1st Avenue also emphasized at the very outset the importance of the FDR (Flight Data Recorder) – 88 Parameters to the Aircraft purchase.

## IV.   Defendants Misrepresented Information Material To The Aircraft Purchase With The Intent To Induce 1st Avenue To Execute The APA

172.    Even without the evidence already presented as to Defendants' fraudulent plan, including Defendants' admission of that plan, there is no justifiable reason for Defendants to have affirmatively misrepresented the significant information material to the Aircraft purchase as detailed above.

173.    The facts set forth herein provide more than sufficient evidence of the reason for Defendants' misrepresentation, and that was for the purposes and intent of inducing 1st Avenue to enter into the APA.

## V.    1st Avenue Justifiably Relied Upon Defendants' Misrepresentations And Would Not Have Executed The APA Had The Information Been Known To It

174.    At the outset of the negotiations Defendants provided a substantial amount of records and when confirmation or additional information was requested, there was nothing presented to 1st Avenue that would lead it to suspect Defendants provided anything other than truthful information.

175.    For example, with FDR (Flight Data Recorder) – 88 Parameters that was included in the marketing material, there was no reason to suspect the validity of Defendants' confirmation that it was part of the Aircraft.  Defendant also confirmed on at least two occasions that the FOD borescope inspection had been performed and the results showed no issues. Finally, regarding the quality of the engines, there was no reason to suggest Seller was telling anything but the truth. The physical appearance of the Aircraft looked well maintained, Defendant emphasized how great their maintenance facility was, and when 1st Avenue visited Defendants' facilities in Mexico they were told the Aircraft was not heavily used for charter, but rather was, in reality, Hank and his family's private plane.

176.    Finally, as established above, Defendants were in control of most material information about the Aircraft and appeared to have been open and honest with disclosures, so 1st Avenue had no reason to suspect anything had been hidden and was fully justified in believing honest disclosures of information solely within Defendants' possession and control had been made.

177.    As has been thoroughly discussed above, the quality of the engines was 1st Avenue's most significant and material element of consideration for this Aircraft purchase. That was expressed and communicated to Defendants from the outset.

178.    Had Defendants not misrepresented the facts and provided truthful answers to the

questions posed by 1st Avenue at the outset, it would not have gone beyond the first exchange of information in December 2019 and 1st Avenue certainly would never have entered into the APA.

## VI.  Resulting Injury To 1st Avenue

179.    As a result of Defendants' intentional misrepresentation of material facts, and 1st Avenue's reasonable reliance on the same, 1st Avenue has incurred and suffered out of pocket damages including, costs and expense incurred for PrivateSky's inspection and related work, expert consultants, professional designers, pre-litigation counsel fees, travel and flight costs, as well as additional miscellaneous costs and expenses that would not have occurred but for Defendants' fraudulent actions, in a total amount in excess of $2,000,000

180.    Based upon Defendants' continued assertion, as detailed below, that Defendants have not breached the APA and the provisions in the APA designed to help protect against unknown or concealed damage do not apply here, 1st Avenue is entitled to pursue additional damages under the tort claims asserted in this complaint, whether or not duplicative in part of the damages available under the contract [where the parties dispute "the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 206 (2d Cir. 2018)].

### THIRD CAUSE OF ACTION
#### Breach of Contract

181.    Plaintiff repeats and realleges each and every previous paragraph as if set forth fully herein.

182.    The APA was final and executed by the parties as of February 5, 2020.

183.    Subject to the various conditions precedent in the APA, as will be presented more thoroughly below, Defendants agreed to sell the Aircraft in Delivery Condition on the Closing Date to 1st Avenue and 1st Avenue agreed to purchase the Aircraft in Delivery Condition on the

33

Closing Date for the full purchase price of $13,500,000.

184.    The Aircraft would be sold by Defendants "as-is" on the Closing Date and 1st Avenue agreed to accept the Aircraft "as-is" on the Closing Date, provided Defendants delivered the Aircraft to 1st Avenue in Delivery Condition on the Closing Date.

185.    1st Avenue had the right to perform an Inspection of the Aircraft prior to purchase and in addition to delivering the Aircraft in Delivery Condition on the Closing Date, Defendants had the obligation to correct all Deficiencies at Defendants' cost prior to the Closing Date.

186.    1st Avenue timely deposited the sum of $500,000 with the escrow company, Insured Aircraft Title Service ("IATS"), to hold in escrow as required pursuant to the APA.

187.    The Inspection commenced on or about February 5, 2020 at PrivateSky's facilities in Fort Myers, Florida.

188.    On March 12, 2020, PrivateSky sent an email to 1st Avenue and Defendants advising of certain results from the inspection at that stage.

189.    PrivateSky informed the parties that there were numerous Discrepancies found in the logbook review, as well as Discrepancies requiring additional evaluation.

190.    Also at that time PrivateSky informed the parties of significant findings from the RR borescope inspection, specifically of the serious erosion and material loss in the engines requiring repeat inspection of that damage be included in the aircraft maintenance records.

191.    On March 13, 2020, PrivateSky notified both parties that the logbook review also indicated the Flight data recorder in the aircraft had not been upgraded to an 88 parameters as had previously been represented to be included as part of the Aircraft.

192.    Beginning on March 18, 2020 letters were exchanged between outside counsel for 1st Avenue and outside counsel for Defendants wherein both sides questioned the other's

intention of complying with the terms of the APA.

193.    On March 25, 2020, counsel for 1st Avenue informed Defendants' counsel that 1st Avenue intended to proceed with the terms of the APA and expected Defendants to do the same. It was also suggested that the parties meet in an effort to work out a business solution to the dispute.

194.    On March 27, 2020, Defendants' counsel indicated they had instructed IATS to release the deposit to Defendants and on March 31, 2020 1st Avenue served Defendants with a Notice of Default based on Defendants' actions and instruction to IATS, providing Defendants with a seven-day period in which to cure as per the APA.

195.    On March 31, 2020, the Defendants withdrew the request to IATS pending negotiations between the parties over the dispute.

196.    The party representatives and principles then began a series of communications regarding the dispute in what 1st Avenue believed at the outset was in good faith efforts to resolve the dispute.

197.    However, on May 4, 2020 Defendants again instructed IATS to release the deposit to Defendants and on May 5 2020, 1st Avenue again issued a Notice of Default to Defendants based upon Defendants' instruction to IATS as well as Defendants' interference with purchasers right to investigate the deficiencies noted with the engines by their instruction to RR not to speak with the purchaser or its representatives regarding the extent of work required to correct the engine deficiencies.

198.    1st Avenue again provided Defendants with a seven-day period in which to cure the breach, reserving its right to later assert anticipatory breach under the law.

199.    On May 12, 2020 Defendants rejected 1st Avenue's demands, specifically they

refused to retract the demand to IATS for the deposit, and refused to allow purchaser the right to speak with RR about the engine damage and costs necessary to remove the additional interval inspection requirement.

200.    However, on May 14, 2020, Defendants informed IATS that it was withdrawing its demand for the deposit to allow the parties further time to negotiate.

201.    The Final Inspection report was issued on May 12, 2020.

202.    On May 15, 2020, 1st Avenue served Defendants with Conditional Acceptance of the Aircraft,[7] subject to correction of the Deficiencies and of Defendants' delivery of the aircraft in Delivery Condition on the Closing Date, and reserving its rights under the outstanding Notice of Default.

203.    Pursuant to Article 3.1[8], Defendants are required to present Purchaser with the "Aircraft" in "Delivery Condition" on the "Closing Date."  Any repair or corrective action that is required to deliver the Aircraft in Delivery Condition is Defendants' responsibility.

204.    Article 3.6 defines those Delivery Condition items requiring such repair or corrective action by Defendants as "Discrepancies." As such, 1st Avenue demanded that Defendants immediately commence the repair and/or corrective action required to remove all Discrepancies identifiable in the PrivateSky Final Inspection Report, Rolls Royce BSI Reports, PrivateSky Log Book Review Report, and/or other APA and Aircraft related materials, including, the specific items noted in that Conditional Acceptance.

205.    Two of the items 1st Avenue specifically identified as Discrepancies in the Conditional acceptance were identified as follows:

---

[7] A copy of the Conditional Acceptance is attached hereto as <u>Exhibit D</u>.

[8] All Article references are as stated in the APA.

(i)     Article 3.1.3 "no non-standard inspection intervals" Discrepancy:  left-hand engine non-standard inspection interval 900-1100 HR repeat inspection requirement as the result of damage erosion and missing material at trailing edge of nozzle guide vanes.  Repair and/or corrective action required to remove Discrepancy; and

(ii)     Article 3.1.3 "no non-standard inspection intervals" Discrepancy:  right-hand engine non-standard inspection interval 900-1100 HR repeat inspection requirement as the result of damage erosion and missing material at trailing edge of nozzle guide vanes.  Repair and/or corrective action required to remove Discrepancy.

206.    In a letter dated May 20, 2020 Defendants' counsel disputed that the items listed qualified as Discrepancies under Article 3.6, asserting that Discrepancies are limited to airworthiness items. However, Article 3.6 defines Discrepancies to not only include airworthiness items, but also all items necessary to "make the Aircraft conform to the Delivery Conditions" ("Discrepancies").

207.    Even if we were to disregard the plain language of Article 3.6 that specifically includes Delivery Conditions in the definition of Discrepancies, the repeat inspection requirement as the result of damage erosion and missing material at trailing edge of nozzle guide vanes identified in the Conditional Acceptance qualifies as both a Delivery Condition and an airworthiness item.

208.    The Aircraft would not be airworthy without the inclusion of this repeat inspection requirement.

209.    Article 3.1.3 requires this repeat inspection requirement be removed prior to the

Closing Date. The only way to remove the repeat inspection requirement and also make the

Aircraft airworthy is if the damage and material loss that resulted in that additional requirement

is corrected.

210.    In the May 20, 2020 letter from Defendants' counsel, Defendants concluded by

stating none of the items listed in 1st Avenue's Conditional Acceptance were Discrepancies

under the APA and as such Defendants refused to comply with its obligation under Article 3.6 to

correct any of the noted Discrepancies.

211.    However, on May 28, 2020, Defendants' counsel informed 1st Avenue that all

Discrepancies had been addressed, the Aircraft had been Returned to Service and was in the

Delivery Condition required under the APA.  Defendants asserted the Closing Date under the

APA was to occur within 5 business days, which set June 4, 2020 as the last day to Close.

212.    Thereafter, upon suggestion by Defendants' counsel that relevant representatives

of the parties have a call to discuss Closing details, representatives of Defendants and Purchaser

exchanged information in verbal and written form to confirm process and satisfaction of Closing

obligations.

213.    In the course of those conversations Defendants advised that the "Defects noted"

in both right-hand and left-hand engines in the Final Inspection, and requiring 900-1100 HR

repeat inspections of both engines, had not been addressed and that the additional 900-1100 HR

repeat inspections remained active as requirements in the Aircraft.

214.    Defendants further refused to make repairs of the noted defects as necessary for

removal of the 900-1100 HR repeat inspection requirements for the Aircraft.

215.    Notwithstanding Defendants' refusal, as of this date it was impossible for repairs

of the noted defects necessary for removal of the 900-1100 HR repeat inspection requirements

for the Aircraft to be accomplished prior to June 4, 2020.

216.    1st Avenue served Defendants on June 3, 2020 with Notice Of Defendants'
Breach and Purchaser's Election to Terminate Agreement pursuant to Article 8.4.1.[9]

217.    1st Avenue was in compliance with all obligations it had under the APA as of the
date of 1st Avenue's service of the Notice Of Defendants' Breach and Purchaser's Election to
Terminate Agreement.

218.    As a result of Defendants' actions and inactions and Defendants' refusal and/or
failure to comply, Defendants breached the following material provisions and obligations of the
APA:

> (i)     Article 3.1.3 Delivery Condition -- "no non-standard inspection intervals"
> as the result of damage erosion and missing material at trailing edge of
> nozzle guide vanes of right-hand engine sufficient enough to require
> inclusion of a new specifically required 900-1100 HR repeat inspection
> interval.
>
> (ii)    Article 3.1.3 Delivery Condition -- "no non-standard inspection intervals"
> as the result of damage erosion and missing material at trailing edge of
> nozzle guide vanes of left-hand engine sufficient enough to require
> inclusion of a new specifically required 900-1100 HR repeat inspection
> interval.
>
> (iii)   Article 3.1.4[10] Delivery Condition -- no "Material Damage" or "Material

---

[9] A copy of the Notice of Defendants' Breach is attached hereto as Exhibit E.

[10] Article 3.1.4 term "Material" as defined in Article 1, means corrosion or damage "….**which cannot be repaired, rectified and terminated** on a non-recurring basis such that the Aircraft can be returned to service **without** a requirement of repetitive or recurring inspections which deviate from the Aircraft manufacturer's normal maintenance procedures or **required modifications to the normal** component life limitations, overhaul and/or **inspection intervals for the Aircraft**" (emphasis added).

Corrosion" as the result of damage erosion and missing material at trailing

edge of nozzle guide vanes of right-hand engine sufficient enough to

require deviation from normal inspection intervals with the inclusion of a

new specifically required 900-1100 HR repeat inspection interval.

(iv)   Article 3.1.4 Delivery Condition of -- "Material Damage" or "Material

Corrosion" as the result of damage erosion and missing material at trailing

edge of nozzle guide vanes of left-hand engine sufficient enough to

require deviation from normal inspection intervals with the inclusion of a

new specifically required 900-1100 HR repeat inspection interval.

(v)   Article I, Definitions, Aircraft, (ii) -- obligation to deliver Aircraft with the

"FDR (Flight Data Recorder) – 88 Parameters" as affirmatively advertised

and represented by Defendants to be included as part of the aircraft's

avionics suite.  [Delivery of Aircraft with inclusion of all equipment and

instruments installed therein.  The parties' intent and common industry

practice is the definition of Aircraft is sufficient to capture all such

equipment and not to separately specify each and every item of equipment

represented to be part of the Aircraft].

(vi)   Article 3.6 Correction of Discrepancies -- Defendants' obligation to

correct all Deficiencies at Defendants' expense.

(vii)   Article 8.4.1 Seller's Default -- within two (2) Business Days following

Demand, Escrow Agent to refund Deposit.

(viii)   Article 8.4.1 Seller's Default -- Defendants shall reimburse Purchaser for

Purchaser's actual costs and expenses incurred for the Inspection and

40

Flight test.

219.    On June 12, 2020, 1st Avenue served Defendants with a Demand for Payment of Liquidated Damages and Reservation of Rights,[11] providing Defendants with the detail of 1st Avenue's costs and expenses allowed under the liquidated damages provision of the APA. 1st Avenue further informed Defendants that if Defendants disputed 1st Avenue's right to recover liquidated damages under the APA for Defendants' Breach, that 1st Avenue reserved all rights it has to proceed against Defendants for fraudulent concealment and other related theories of liability.

220.    Defendants continue to assert that because the repeat inspection requirement, which was imposed by RR as the sole and direct result of the damage and defects to the engines discovered by RR, and now placed in the aircraft maintenance record with clear identification of the specific reason for that repeat inspection as "Defects noted: the trailing edge of the nozzle guide vanes have erosion and missing material",  happens to fall within the same time frame as an unrelated general inspection requirement for the engines, that the RR mandatory repeat inspection of noted damage requirement does not qualify as a "non-standard inspection interval"

221.    As a result of Defendants' breach, 1st Avenue has been damaged, was forced to terminate the contract and is now entitled to recover is losses allowed under the law, according to proof resulting from Defendants' breach.

222.    Further, as a result of the concealment and misrepresentation of Defendants as presented above, under New York law 1st Avenue is not limited by the liquidated damages provision in this agreement and is entitled to seek all damages recognized under the law for breach of contract, which it is claiming here. *See Horowitz v. Nat'l Gas & Elec., LLC*, 2018 U.S.

---

[11] A copy of the Demand for Payment is attached hereto as <u>Exhibit F</u>.

Dist. Lexis 163285, at 23 (S.D.N.Y. Sep. 24, 2018); *United States v. Merritt Meridian Constr. Corp.*, 95 F3.d 153 (2d Cir. 1996).

### FOURTH CAUSE OF ACTION
#### Breach of Contract – Good faith and Fair Dealing

223.    Plaintiff repeats and realleges each and every previous paragraph as if set forth fully herein.

224.    New York imposes upon every party to a contract a duty of good faith and fair dealing in the performance and enforcement of a contract.

225.    Defendants' conduct frustrated the purpose of the APA and prevented 1st Avenue from receiving the fruits of the agreement.

226.    1st Avenue was to purchase the Aircraft "as-is" with the right to Inspection.  This right to inspect was of crucial importance to 1st Avenue as the primary focus of its entire search for an aircraft was that the aircraft have well-maintained engines.

227.    Upon execution of the APA, the parties intended that the Aircraft would receive a full logbook review and full technical inspection at PrivateSky's facility.

228.    1st Avenue believed and understood that this inspection and review would be an open and transparent process.  However, Defendants had no intention of permitting 1st Avenue to meaningfully engage in the inspection and review.

229.    After execution of the APA, when the parties were scheduled to fly from Mexico to PrivateSky's facilities and 1st Avenue inquired as to why the Defendants' pilot shutdown one of the Aircraft's engines during the customs process in Mexico, Defendants' pilot appeared to evade the question to prevent any further inquiry regarding the Aircraft's engines.

230.    Defendants proceeded to prevent 1st Avenue to engage meaningfully in the inspection, which would have uncovered the engine damage and Defendants' deceit.

231.    For example, Defendants prevented 1st Avenue and its representatives from talk

with any of Defendants' representatives during the inspection, preventing 1st Avenue from being

able to fully appreciate the severity of the engine damage.

232.    Further, Defendants instructed RR to not disclose anything to 1st Avenue as to any

prior inspections, mechanical or reparative work, or any other information that would be useful

to 1st Avenue during the inspection and review process.

233.    Defendants' attempts to prevent 1st Avenue from meaningful engagement in the

Inspection directly deprived 1st Avenue of its benefits under the APA.

234.    1st Avenue's right to an open, transparent, and engaging Inspection is not contrary

to any express provision in the APA, nor is Defendants failure to provide such an Inspection an

express breach of the APA.

235.    Because of Defendants' breach of the implied covenant of good faith and fair

dealing, 1st Avenue has been damaged due to the interference with its ability to exercise its right

to investigate and inspect the aircraft and thus was forced to terminate the contract and is now

entitled to recover is losses allowed under the law and according to proof resulting from

Defendants breach. Further, as a result of the concealment and misrepresentation of Defendants

as presented above, under New York law 1st Avenue is not limited by the liquidated damages

provision in this agreement and is entitled to seek all damages recognized under the law for

breach of contract, which it is claiming here.  See Horowitz v. Nat'l Gas & Elec., LLC, 2018

U.S. Dist. Lexis 163285, at 23 (S.D.N.Y. Sep. 24, 2018); United States v. Merritt Meridian

Constr. Corp., 95 F3.d 153 (2d Cir. 1996).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants, awarding Plaintiff:

1.     Compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including all interest thereon;

2.     Punitive damages;

3.     Equitable relief, including, but not limited to, rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

4.     Reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

5.     Such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated:  July 8, 2020                    PILLSBURY WINTHROP SHAW PITTMAN LLP

By: /s/ Ari M. Berman
    Ari M. Berman
    Michael J. Pisko
    31 West 52nd Street
    New York, NY  10019
    Phone:  +1.212.858.1000
    Fax:  212.858.1500
    ari.berman@pillsburylaw.com
    michael.pisko@pillsburylaw.com

    Douglas R. Tribble (*pro hac vice forthcoming*)
    501 West Broadway, Suite 1100
    San Diego, CA  92101-3575
    Phone: +1.619.544.3379
    Fax:  619.236.1995
    douglas.tribble@pillsburylaw.com

44

*Attorneys for Plaintiff 1ST AVENUE TJC, LLC*